**Charles Horn, Appellant, v. J. O. Nessen Lumber Company et al., J. O. Nessen, Appellee.**

## Gen. No. 28,992.

1. Contracts—*when contract to repurchase corporate stock not enforceable for breach by plaintiff*. Where a contract was made between the president of a corporation and an employee under which the employee purchased stock in the corporation and became its secretary and it was agreed that both should devote their energies to the business and that in case of breach of the contract by the president the secretary could require the president to purchase the stock at its book value, such purchase could not be enforced unless the secretary could show that he had not violated the contract himself, and where he failed to do so but it appeared that it had been breached by both parties, payment of the book value of the stock could not be compelled.

2. Contracts—*validity of contract between stockholders for control of corporate affairs*. A contract between two stockholders of a corporation by which it was agreed that they should be directors and officers for a period of ten years and that their salaries should be fixed at certain sums was not invalid as being contrary to public policy.

3. CONVERSION—*of corporate stock by unlawful retention in violation of agreement of sale.* Where an employee of a corporation purchased stock therein, giving his note therefor, and became its secretary under an agreement with the president that the latter should retain possession of the stock until it was paid for and the secretary, together with his attorney and others, went to the corporation's place of business and made a valid tender of the balance due and demanded the stock, which was refused, and in suits which followed the president contended that the stock was fraudulently obtained and prayed for a decree finding that it belonged to him and did not tender the stock for over two years, his action amounted to a conversion of the stock.

4. CONVERSION—*tender of return of converted property after conversion as effecting liability for damages.* After conversion of personal property the wrongdoer cannot escape liability nor lessen the actual damages by tendering back the property.

5. CONVERSION—*when equity has jurisdiction of conversion.* In a suit over certain corporate stock in the possession of defendant and claimed by plaintiff where it appeared there were several suits growing out of the controversy and the two chancery cases were consolidated and the actions at law dismissed pursuant to a stipulation between the parties, which also provided that complainant might file an amended and supplemental bill claiming the actual cash value of the stock because of defendant's failure and refusal to deliver it, the court of chancery had jurisdiction to determine the matter of conversion of the stock by defendant.

6. VALUES—*elements in determining market value of corporate stock.* In determining the market value of the capital stock of a lumber corporation, the stock of which was not on the market, contracts whereby the corporation advanced money to enable certain mills to manufacture lumber which the corporation was to sell, receiving a commission, were properly omitted, it not appearing that one of the contracts had any value or when it was to expire; and it appearing that another had practically expired while the third was subject to cancellation by either party upon thirty days' notice.

7. APPEAL AND ERROR—*refusal of Appellate Court to search record for evidence of error.* Where the value of certain items considered by the master in determining the value of corporate stock was claimed by plaintiff to have been placed too low but plaintiff does not point out the testimony given by defendant's witnesses on that question, the court will not search the voluminous record for such testimony and the finding of the master will not be disturbed.

8. VALUES—*earned profits as elements of value of corporate*

*stock.* In determining the value of the stock of a lumber corpora-
tion on a certain date the profits made on orders on hand on that
date but filled later should be considered.

9.   GOOD WILL—*estimate of expert accountant as evidence of
value.*   In a suit involving the value of certain corporate stock
a statement made in the report of an expert accountant that a
conservative estimate would establish the value of the good will
at $60,000 was insufficient to warrant an allowance for that item.

10.   COSTS—*apportionment and taxation between parties.*   In a
suit to recover the value of corporate stock belonging to plaintiff
and held by defendant, where plaintiff contended that he was
entitled to the book value of his stock and on appeal it was found
that the master erred in so finding it, would be inequitable to tax
all of the costs against defendant and the costs of the trial court
should be equally divided, but plaintiff having been defeated in the
trial court and the decree reversed with directions to enter judg-
ment for plaintiff, the costs on appeal should be charged against
defendant.

Appeal by plaintiff from the Circuit Court of Cook county; the
Hon. GEORGE FRED RUSH, Judge, presiding.   Heard in the third
division of this court for the first district at the October term,
1923.   Reversed and remanded with directions.   Opinion filed Febru-
ary 11, 1925.   Rehearing denied and opinion modified March 2,
1925.

DAVID K. TONE, for appellant.

GOOD, CHILDS, BOBB & WESCOTT and McCORMICK,
KIRKLAND, PATTERSON & FLEMING, for appellee; WEY-
MOUTH KIRKLAND, CHARLES F. RATHBUN and JAMES
B. WESCOTT, of counsel.

MR. PRESIDING JUSTICE O'CONNOR delivered the
opinion of the court.

On June 15, 1920, Charles Horn filed his bill of
complaint against the J. O. Nessen Lumber Company,
a corporation, A. J. Nessen and others, praying that
J. O. Nessen be required to pay complainant the book
value of 200 shares of capital stock (owned by com-
plainant) in the Lumber Company in accordance with
the terms of a contract entered into between com-

plainant and Nessen on the 30th of June, 1915, claiming that Nessen had breached that contract on September 9, 1920. All of the defendants filed a joint and several answer, in which the making of the contract was admitted, but it was denied that Nessen breached it. The answer further set up that Horn had commenced an action of assumpsit against Nessen in the superior court of Cook county, wherein Horn sought to recover from Nessen the value of the 200 shares of stock, which were alleged to be worth $118,000. The declaration was attached to and made a part of the answer and shows that the assumpsit suit was to the March term, 1920, of the superior court of Cook county. The answer further averred that in addition to the assumpsit suit, Horn had filed an action of trover against Nessen in the circuit court of Cook county to recover the value of the 200 shares of stock, and that he had also filed another suit against Nessen, seeking to recover the penalty provided by the Corporation Act for failure on the part of Nessen to permit Horn to examine the books of the Lumber Company. It was further averred in the answer that Horn had obtained the stock through misrepresentation, and, therefore, was not entitled to own or hold the stock, but that the defendants were ready and willing to compensate Horn for whatever amount the court might find due for services rendered by him to the Lumber Company.

On June 25, 1920, Nessen filed his bill of complaint in the circuit court of Cook county against Horn, wherein Nessen alleged that Horn had induced him to sell to Horn 200 shares of the capital stock of the Lumber Company by false representations, and charged that Horn had been guilty of other acts of misconduct, and prayed that a decree be entered canceling the contract of June 30, 1915, and that Nessen be decreed to be the owner of the 200 shares of stock; that an accounting be taken to determine what, if

anything, there was due to Horn by reason of any services he had rendered the Lumber Company.

On November 9, 1920, Horn and Nessen entered into a written stipulation whereby it was stipulated and agreed that the two chancery causes, the one filed by Horn against Nessen and others and the other by Nessen against Horn, be consolidated as one cause; that Horn withdrew his demurrer to Nessen's bill and file an answer within fifteen days; that Horn dismiss the three actions at law which he had then pending against Nessen, viz., the assumpsit, trover and the action to recover the statutory penalty; that Horn should have the right to file an amended and supplemental bill in lieu of his original bill, and that he should also have the right to set forth in such amended and supplemental bill any and all claims and demands which he might have against Nessen in any of the three actions which he thereby agreed to dismiss, or any other cause of action. It was further stipulated and agreed that neither Nessen nor Horn should make any defense in the consolidated cause; that there was a complete and adequate remedy at law for any claims made by either against the other and such defense was expressly waived; that Horn should file his amended and supplemental bill within fifteen days and the defendants their answer within twenty-five days and that Horn was to amend his bill so as to eliminate any claim for relief based upon the alleged mismanagement by Nessen of the Lumber Company's business, occurring subsequent to January 1, 1920. In accordance with the stipulation Horn dismissed the three actions he had pending against Nessen, withdrew his demurrer, and filed an answer to Nessen's bill and on November 16, 1920, filed his amended and supplemental bill against Nessen, the Lumber Company and others in which he alleged that the Lumber Company was incorporated in 1911; that it had a board of three directors; that

Horn was a director and the secretary of the company and served from the date of the incorporation of the company until January, 1920; that Nessen was president and treasurer and a director of the company since 1911; that in May, 1911 Nessen importuned Horn to buy 200 shares of the capital stock of the Lumber Company for $20,000; that in payment of the stock Horn made and delivered his promissory note for $20,000 to Nessen; that the note was to be paid only out of the dividends which might be paid on the 200 shares of stock; that the contract of 1911 was abrogated and a new contract in writing entered into between the parties dated June 30, 1915, which contract is set up *in hæc verba*. It recites that the J. O. Nessen Lumber Company was organized as a corporation under the laws of the State of Illinois with a capital of $100,000, consisting, of 1,000 shares, which shares were owned as follows: J. O. Nessen 550 shares, Charles Horn 200 shares, A. J. Nessen 200 shares and George J. Green 50 shares; and that the officers and directors were J. O. Nessen, president and treasurer, A. J. Nessen, vice president and Charles Horn, secretary. It is further stated in that agreement, that it was the desire of J. O. Nessen and Charles Horn to control the corporation for a period of ten years. By the terms of the contract it was agreed that during the life of the contract the stock held by J. O. Nessen and Charles Horn should be voted at each annual meeting of the stockholders in favor of J. O. Nessen, Charles Horn and A. J. Nessen, the object being to continue the three persons as directors during the life of the contract.

It was further provided in the contract that the directors elected during the ten-year period should elect as officers of the Lumber Company J. O. Nessen as president and treasurer, A. J. Nessen as vice president and Charles Horn as secretary; that J. O. Nessen should be paid as a salary for his services

the sum of $5,000; that Horn should be paid for his services an annual salary of $4,200; that no other salaries should be paid any other officer of the company, and that the salaries of Nessen and Horn should not be changed without the consent of both parties to the contract.   It further provided that J. O. Nessen and Charles Horn should operate with each other in all matters pertaining to the business of the company; that each should apply himself diligently in the conduct of the company's business and that a failure to do so should constitute a breach of the agreement "giving the right of termination of this agreement to the party not violating the same."   And it was further provided that should there be any dispute between the parties as to whether there was such breach, then that question should be left to a board of arbitration, consisting of three arbitrators, one to be chosen by Nessen, one by Horn and a third chosen by those two, and that a decision of the arbitrators should be final and binding; that in case either of the parties to the contract should desire such an arbitration, he should give written notice to the other to this effect, name his arbitrator, and the other party was required within ten days to name his arbitrator. The contract further provided that during the life of the contract, neither party should sell or offer his stock in the company, or any part of it, without first offering it to the other or to the corporation itself— and that the other party might have the right to purchase the stock thus offered for sale at the book value at any time within thirty days after receiving written notice from the party desiring to sell.   It was provided that neither party could sell stock, except as above, unless the other party or the corporation failed to purchase it within thirty days after notice and that all notices mentioned in the contract should be by registered mail.

The contract further provided that in the event

of a breach of the contract on the part of J. O. Nessen by his failing to co-operate with Horn or to apply himself diligently to the business of the Company, "and in the event that the said Charles Horn shall not have violated this contract on his part to be performed, and in the event that the said Charles Horn should, by reason of such breach of contract by the said J. O. Nessen, desire to dispose of his stock, then the said J. O. Nessen agrees that within thirty (30) days after receiving written notice to the effect that the said Charles Horn desired to dispose of his stock, he will purchase the stock of the said Charles Horn and pay in cash the book value therefor.

"It is understood and agreed that wherever the term 'book value' is used in this contract, the said book value shall be arrived at by taking the merchandise, fixtures, personal and real properties, belonging to the company at the fair cash market value therefor, and adding thereto the amount of all good and collectible accounts and bills receivable belonging to the company, and the cash on hand belonging to the company, and deducting therefrom all debts and obligations of every kind and character owing by the company, and by this method the book value of the stock of the company shall be arrived at."

The contract further provided that if Horn sold his stock, there should first be paid out of the proceeds of such sale the amount remaining due upon his note, dated May 1, 1911, and payable to J. O. Nessen; that in the event Nessen purchased any of Horn's stock, he should pay 25 per cent on or before three months, 25 per cent on or before six months, 25 per cent on or before nine months and 25 per cent on or before one year after the date of such purchase with interest on the amount remaining due at 6 per cent until paid.

The bill further alleges that J. O. Nessen, at all times, had control of a majority of the capital stock of the Lumber Company; that during the time Horn was

connected with the Lumber Company its business was very profitable and substantial dividends were declared from time to time and paid, such dividends as were payable to Horn being applied to the payment of the $20,000 note; that on the 7th of June, 1920, there remained due and unpaid on the note $5,500 with interest at 6 per cent from the 1st of January, 1920; that the contract entered into between complainant and J. O. Nessen was spread upon the records of the Lumber Company; that from May, 1911 until January, 1920, the business management and control of the Lumber Company was exercised by J. O. Nessen and Horn, and it is averred that Horn diligently applied himself to the business of the company and endeavored to co-operate with Nessen in promoting the best interests of the company until the 9th of September, 1919; that Nessen did not devote his time and energy to the business, and did not co-operate with Horn, but refused and failed to do so, in that Nessen absented himself from the business for long periods of time and devoted considerable time in the pursuit of pleasure and speculated on the stock market and refused repeatedly to co-operate with Horn in the transaction of the business; that Nessen interfered with Horn in the conduct of the business and usurped to himself the control of the business to the great loss of the stockholders. It was further alleged that Nessen wrongfully collected and appropriated to his own use moneys belonging to the Lumber Company; that on the 9th of September, 1919, Nessen in violation of the terms of the contract of June 30, 1915, wrongfully and arbitrarily refused to co-operate with Horn in conducting the business of the Lumber Company and refused to act under the contract; that Nessen at that time ordered Horn to immediately turn over to Nessen all documents and records belonging to the Lumber Company and ordered Horn to leave the com-

pany's office and to cease any further activities in connection with the Lumber Company's business; that afterwards on the same date Nessen told Horn that he would pay Horn the book value of the 200 shares of stock in accordance with the contract of June 30, 1915, and that Horn agreed to accept such payment; that thereupon the parties proceeded to ascertain the book value of the stock by examining the books and documents of the Lumber Company, and that after such examination Nessen said to Horn that the book value of the 200 shares of stock as shown by the books of the company was $63,770, which sum Nessen stated he was ready to pay; that Horn replied he was willing to accept the book value in accordance with the terms of the contract, but that the book value of his stock was more than that shown by the books on that date; that certain lumber and timber contracts and other items should be included; that afterwards both parties employed counsel to look into the matter and it was agreed that while negotiations were being had in endeavoring to arrive at the book value of the stock, Horn should continue in the performance of his duties and that the parties should attempt to reach an amicable agreement as to the book value of the stock.

It is further alleged that during the year 1919, Nessen neglected the business of the Lumber Company and spent a great deal of his time at clubs and pleasure resorts and on account of such neglect the department which was under the immediate charge of Nessen showed a loss of approximately $30,000; that during the same time the department in charge of Horn showed a profit of about $40,000, for the reason that Horn attended strictly to the business of the company; that on the 3rd of December, 1919, Horn gave Nessen a written notice, by registered mail, in accordance with the provisions of the contract of June 30, 1915, wherein Horn elected to sell

his stock to Nessen at the book value; that Nessen acknowledged receipt of the letter, stating that he would not purchase Horn's stock; that the latter could sell it to any person that Horn might see fit. The bill then set up the ownership by the Lumber Company of the stock of all of certain subsidiary corporations which it is claimed were assets of the Lumber Company, which should be taken into consideration in fixing the book value of the 200 shares of the stock.

It is further alleged that at the annual meeting of the stockholders held on the 28th of January, 1920, Horn was not elected as a director, nor as an officer of the company, and this was brought about by Nessen who owned and controlled a majority of the capital stock of the company; that upon the stockholders electing other directors and the directors electing other officers of the company, Nessen notified Horn of this fact and that the company would dispense with his services and requested Horn to leave; that Horn objected to this, stating to Nessen that it was in violation of the contract of June 30, 1915. It is further alleged that the book value of Horn's stock was about $160,000; that there remained due and owing to Nessen on the $20,000 note, the payment of which was secured by Horn depositing with Nessen the certificate for the 200 shares of stock, about the sum of $5,500. It is further alleged that on the 7th of June, 1920, Horn tendered to Nessen at the Lumber Company's office the balance remaining due on the $20,000 note and demanded his stock certificate for the 200 shares; that Nessen refused to take the money or to return the stock; that afterwards on the same day Nessen wrongfully and maliciously converted the 200 shares of stock to his own use, and had deprived Horn of the possession and ownership of the stock since that time. The bill further alleges that on the 7th of June, 1920, Horn requested of Nessen that he

be permitted as a shareholder of the Lumber Company to examine the books and records of the Lumber Company which were under Nessen's control, which Nessen refused, stating that Horn had no right to inspect the books of the company as Nessen did not know whether Horn was a shareholder or not; that the fair cash value of the stock so wrongfully converted by Nessen was $175,000; that on the afternoon of June 7, 1920, Horn demanded of Nessen, who had possession of the records, that he be permitted to examine them as he was a shareholder in that company; that Nessen refused contrary to the statute of the State of Illinois and, therefore, Horn claimed he was entitled to 10 per cent of the value of the stock as a penalty, the amount of this claim being $17,500. It is further alleged that during the years 1919 and 1920, the Lumber Company was in possession of the good will of its business which was exceedingly valuable, that the stock was not listed or dealt with on any stock exchange, but it was worth $175,000 in the month of June, 1920. The bill prayed that Nessen be required to pay to Horn the book value of the 200 shares of the stock in accordance with the provisions of the contract of June 30, 1915; that if this relief was not decreed, that Nessen be required to pay to Horn the fair cash value of the stock as of June, 1920, the time it was alleged that Nessen converted the 200 shares to his own use.

On November 24, 1920, the defendants filed demurrers to the amended and supplemental bill and on February 16, 1921, the court sustained the demurrers of all the defendants, except Nessen, whose demurrer was overruled for the reason, as stated in the order, that Nessen and Horn had entered into the stipulation above mentioned.

On March 1, 1921, Nessen filed his answer to the amended and supplemental bill in which he alleged (inter alia) that the contract of June, 1915, was en-

tered into at the solicitation of Horn and upon his representations that he had always worked faithfully for the Lumber Company and would continue to do so, but that such representations were false and untrue; that Nessen did not fail to co-operate with Horn in the business of the company; that he did not appropriate any of the money of the company to his own use or speculate on the stock markets. The answer further denies that Nessen violated the contract on September 9, 1919, or at any other time, and denies that he ordered Horn to leave the office at that time, and avers that Horn violated the terms of the contract by taking the records and files belonging to the Lumber Company from the office of that company. The answer further denies that on September 9 he told Horn he would pay him the book value of the stock and that the books then showed that the value of Horn's stock was $63,770. It further averred that Nessen neither admits nor denies that on June 7, 1920, Horn tendered to him the balance remaining unpaid on the $20,000 note and denies that Horn requested the certificate of the 200 shares of stock at that time, and denies that he converted the stock to his own use.

On May 20, 1921, Nessen by leave of court, filed an amendment to his answer, wherein he averred that the contract of June 30, 1915, was illegal and void as being contrary to public policy.

The consolidated cause was referred to a master in chancery to take the proofs and make up his report, together with his recommendations. The evidence taken before the master was voluminous, consisting of 4,625 typewritten pages. He made up his report and found the equities were with the complainant and that Nessen had breached the contract on September 9, 1919, and recommended that a decree be entered requiring Nessen to pay to Horn the book value of the 200 shares which he found, accord-

ing to the terms of the contract of June 30, 1915, was $77,370. He also found that there was due and unpaid on the $20,000 note $5,621.13, leaving a net amount due Horn of $71,748.87. The master further found that Nessen had failed to prove any of the charges made by him against Horn in the Nessen bill, and that no evidence was presented to support the allegations of it, and that he had treated the entire matter as a consolidated cause, but if Nessen's bill should be treated as a separate matter, the master recommended that it be dismissed for want of equity.

Nessen filed objections to the master's report. They were overruled and afterwards were ordered to stand as exceptions before the chancellor. On the hearing of the exceptions the chancellor found "that the complainant is entitled to receive a certificate of stock for 200 shares of the company stock of the J. O. Nessen Lumber Company, an Illinois corporation upon payment to the defendant, J. O. Nessen, of the amount remaining due and interest thereof on account of the purchase price of said stock." And further found that the contract of June 30, 1915, was illegal and void as being against public policy, and the amended and supplemental bill were dismissed for want of equity. The costs were taxed equally between Horn and Nessen. To reverse the decree Horn prosecutes this appeal.

The evidence discloses J. O. Nessen began working in the lumber country near Manistee, Michigan, when he was about eighteen years old by carrying and assisting in surveying. After a number of years he was employed by a lumber company at that place and later began trading in lumber on his own account. His business grew until he was handling about 175,000,000 feet of lumber per year when he left Manistee in 1911 and came to Chicago. During the time

he was in business in Michigan, he employed the complainant Charles Horn, who was then a young man, as bookkeeper and stenographer. Horn continued to work for Nessen until the business was moved to Chicago. The master found that Horn during the period he was employed by Nessen in Michigan "worked day and night without regard to business hours and with no consideration of any element, but the success of the business." It further appears from the evidence that Horn came to Chicago with Nessen at the latter's request and in May, 1911, Nessen organized the J. O. Nessen Lumber Company, the capital of which was $100,000.00 and assigned the assets of his business in payment of all the stock. Horn was named in the articles of incorporation as owning 200 shares of stock at a value of $20,000, but he paid no money for the stock at the time it was issued to him. At that time Nessen induced Horn to purchase 200 shares of the stock for the par value thereof, viz., $20,000, and to give his note for that amount to Nessen in payment of the stock, it being agreed that the note was not to be negotiated and was to be payable only out of the dividends that might be declared on the stock. A certificate for 200 shares of stock was issued to Horn. Horn executed his note for $20,000 to Nessen who was given the unindorsed stock certificate as collateral security. Dividends were declared from time to time and applied toward the payment of the note until September, 1919, when there was remaining due the sum of about $5,500.

After a time this contract of 1911 became unsatisfactory to Horn and a new agreement was made between himself and Nessen in 1913. This was also found unsatisfactory to Horn and, after some negotiations, the parties entered into the contract in question dated, June 30, 1915. Nessen was a man of about sixty years of age and Horn was many years younger, and it appears that Nessen took va-

cations such as going to Palm Beach and French Lick Springs for short periods of time, leaving Horn in charge of the business. Horn appears to have been a man of great energy and industry and devoted long hours to the business of the company. He also appears to have been a man of violent temper, as disclosed by letters and telegrams which he sent to Nessen. In March, 1918, Nessen was taking a short vacation at Palm Beach and on the second of that month he wired Horn, who was in charge of the business in Chicago, to the effect that he had been absent a week and had no word from the office, although he had instructed Horn and another employee to write him often regarding the business and stating that if anything was wrong for Horn to wire him and he would return at once. To this Horn replied by telegram: "I consider your telegrams second and third entirely uncalled for and out of order. Everything here is in splendid condition * * *. Nothing here warrants your immediate return, but would be glad to see you any time. Assumed you were at Palm Beach for rest and was not disposed to worry you with details. On other hand, have all I can do and do not wish to be burdened unnecessary correspondence." And on the following day he wrote Nessen a letter in which he said: "In reply to your telegrams of the second and third inst. I do not feel that you are in order in sending those telegrams and if you do not agree with me I am willing to promptly arbitrate same under our contract, as well as some other matters I do not feel right about. Everything in splendid condition as usual, in fact much better than usual. I assumed you had gone to Palm Beach for rest so I did not feel disposed to burden you with a whole lot of unnecessary correspondence. On the other hand I have about all I can look after the way I attend to my matters and I do not want to be burdened with unnecessary correspondence although I will be very glad

to work overtime any time to advise you of anything of account. * * * P. S. Your actions in sending these telegrams is disgusting and indicates a considerable loss of balance of judgment. You should be ashamed of yourself.''

The following year in May, when Nessen was at French Lick Springs, the evidence discloses that he had endeavored to communicate with Horn by the long distance telephone. Horn was out of the office attending to the business of the company, and he was advised by another employee of the fact that Nessen was trying to communicate with him by telephone and the employee indicated that Nessen was in an angry frame of mind. Horn thereupon sent the following telegram on May 3 to Nessen: ''M. Starck has just reported to me your scurrilous telephone message of today which is demoralizing and unwarranted and I hereby give you the required ten days notification after you return to the office that this and other matters will be immediately referred to arbitration under our contract.''

Three days afterwards on May 6, after Nessen had returned to Chicago, Horn wrote him a letter in which he quoted the telegram of May 3, and then said: ''As you arrived at the office this morning I am referring matters in question under contract of June 30th, 1915, to Mr. Eastman as my arbitrator.'' In this letter it will be seen, as well as in the letter of March 15, 1918, which was written about a year prior, that Horn was taking the position that the contract had been breached by Nessen for the latter's failure to co-operate in the conduct of the business as provided for in the contract and in the letter of May 6, 1919, above referred to, notified Nessen that he had selected Mr. Eastman as his arbitrator, under the contract providing that in case there was a dispute as to whether there had been a breach, the question should be submitted to arbitrators.

The evidence further discloses that on September 9, 1919, a controversy arose between the parties in the office of the Lumber Company. It appears that Nessen was looking for some files and asked Horn about them. Horn's version of the matter, as testified to by himself and several other employees of the Lumber Company, was that he got to the office at a quarter to eight on the morning of September 9; that Nessen did not appear until about twelve o'clock; that Horn was dictating a letter; that he spoke to Nessen, but that the latter did not reply but that Nessen asked him about some business, stating that Horn had not attended to it; that Horn replied he had done so and if Nessen did not believe him to look in the files of the matter; that Nessen replied he did not have to look in the files, but could ask him and that he wanted Horn to understand it. Horn stated "I do understand that most clearly and I will be very glad to give you any information you ask for, but I want you to ask me in a civil, courteous tone of voice"; that thereupon Nessen told Horn that he was discharged and to get on his hat and coat and go; that he would have another man in his place in the morning and that Horn said he would go upon condition that he received the book value of this stock.

On the other hand, Nessen's contention is as testified to by himself and another employee; that he got to the office about nine o'clock on the morning in question, and that after dictating some letters he asked Horn if he knew about a certain business matter; that Horn replied abruptly that he did not; that Nessen returned to his office and searched through the files; that about eleven o'clock he could find no record in regard to the matter and went back to Horn's office and spoke to him about the matter; that Horn said, "if you want to know anything about it, go through the files"; that Nessen replied he had gone through the files, and that Horn then said that

Nessen was a "G— D— liar," and thereupon Nessen told him to go.

We have carefully considered all of the evidence in the record as bearing on the question as to whether either or both of the parties breached the contract by failing to co-operate with each other and using their best efforts to promote the business of the company, and are clearly of the opinion that both parties were at fault. Nessen had worked many years in building up the business before he incorporated it, and after the company was incorporated in 1911, although Horn had a fifth interest in the company, Nessen continued to conduct the business as though it were his own, and this is little more than might be expected under the circumstances, although not in accordance with the terms of the contract. He treated Horn as though he were still an employee of his. He did not put in the long hours at work that Horn did, nor could he be expected to do so, considering his age. We think it clear upon a consideration of all the testimony in the record that Horn did not call Nessen a liar on September 9, and that this version of the occurrence of September 9 was an afterthought on the part of Nessen.

Under the terms of the contract, Horn could not require Nessen to pay for his 200 shares of stock on the ground that Nessen had breached the contract, unless it further appeared that Horn himself had not violated its terms, and the burden of proof in this case was on Horn to establish not only that Nessen breached the contract, but that he himself was not to blame. In this we think Horn has failed, for we are clearly of the opinion that both Horn and Nessen were to blame, and that the conduct of each of them resulted in a breach of the contract. In these circumstances, Horn could not compel Nessen to pay the book value of the 200 shares of stock.

A great deal has been said in the briefs filed by

both parties as to the validity of the contract of June, 1915, Nessen taking the position that it was invalid because it provided that Horn and Nessen should be directors and officers of the company for a period of ten years, and their salaries were fixed at certain sums, and it is said that such provisions are against public policy and the contract is therefore void. Complaint is also made that the contract is not enforceable, because it is not mutual in certain respects, which it is unnecessary for us here to point out. We think neither of these contentions is sound. Contracts of similar import have been sustained by the Supreme Court of this State in *Faulds v. Yates,* 57 Ill. 416, and *Kantzler v. Bensinger,* 214 Ill. 589, and these cases have been repeatedly approved by our Supreme Court. We are of the opinion that the contract is valid and binding, but since Horn has failed to show that the contract was breached through no fault of his, he is not in a position to enforce it.

But counsel for Horn contends that his bill was filed with a double aspect and in case it here held that Horn could not compel Nessen to pay for the book value of the stock as provided by the terms of the contract, and that he should be given an alternative relief requiring Nessen to pay the fair cash value of the stock by reason of his conversion of it on June 7, 1920. To this contention Nessen's counsel replies, that as a matter of fact there was no conversion of the stock by Nessen on June 7, 1920, or at any time, and that an action for conversion is a legal and not an equitable proceeding, of which equity has no jurisdiction, and can have none by stipulation of the parties. In support of these contentions, it is said that the evidence discloses that Nessen did not convert the stock to his own use on June 7, 1920, because the evidence fails to show that Horn tendered the amount remaining unpaid on the note at that time,

and that the evidence further shows that Nessen did not refuse to deliver up the stock, but stated that he wanted to confer with his counsel. The record discloses that on June 7, Horn, together with Albert N. Eastman, a member of the Chicago Bar, and others, went to the Nessen Lumber Company's place of business, and Mr. Eastman testified in detail as to what took place, and that he made the tender and demand of the stock. Upon a consideration of the evidence, we are clearly of the opinion that a proper tender of the amount due and unpaid on the note and a demand for the stock was made. We are also clearly of the opinion that what Nessen did on that date and subsequently amounted in law to a conversion of the stock. Eight days afterwards, on June 15, Horn filed his bill of complaint wherein he claimed the stock and ten days after that date, June 25, Nessen filed his bill of complaint wherein he alleged that Horn had obtained the stock through fraudulent representation and prayed that a decree be entered finding that the stock belonged to Nessen and not to Horn. Furthermore, after the several pleadings were filed in the various causes, all of which go to show that Nessen was claiming the stock, and after there had been protracted hearings before the master in which nearly 5,000 pages of testimony was taken and after both sides had stated to the master that they had closed their proofs, Nessen for the first time, on April 19, 1922, on the hearing before the master, tendered the stock to Horn's counsel. This tender was of no effect, for nearly two years after June 7, 1920, Nessen had been claiming the stock as his own, and Horn was not seeking to recover it, but only its book value, or its actual cash market value, so that it appears that both parties were taking the position that the stock should be and remain the property of Nessen. It is the law that after a conversion of personal prop-

erty, the wrongdoer cannot escape liability, nor lessen the actual damage by tendering back the property. *Munier v. Zachary,* 138 Iowa 219; *Baltimore & O. R. Co. v. O'Donnell,* 49 Ohio St. 489; *Carpenter v. Dresser,* 72 Me. 377; *Brewster v. Silliman,* 38 N. Y. 423; 28 Amer. & Eng. Encyc. (2nd Ed.) 683; *Gorham v. Massillon Iron & Steel Co.,* 284 Ill. 594.

In the *Munier* case, the Supreme Court of Iowa said: "After the conversion of property has become complete, the wrongdoer cannot escape liability, nor lessen the actual damage recoverable by a tender back of the property."

We think there was a conversion of the 200 shares of stock although the certificate was not indorsed by Horn. Nessen not only denied that Horn was the owner of the stock but contended that it belonged to him. *Reading Finance & Securities Co. v. Harley,* 186 Fed. 673; *Lewis v. Bidwell Electric Co.,* 141 Ill. App. 33; *Payne v. Elliott,* 54 Cal. 339; *Liptrot v. Holmes,* 1 Ga. 381.

Of course, the action of trover is an action at law of which chancery has no jurisdiction, but in view of the stipulation entered into between the parties, whereby it was mutually agreed that Horn might file an amended and supplemental bill in which he might claim the actual cash value of the stock by reason of the fact that Nessen had refused to deliver it, but was claiming it as his own, and further in view of the fact that it was expressly agreed that neither party would contend that such matters were not cognizable in a court of equity and when it further appears that there were a number of suits pending between the parties, five in all, and that it was agreed to consolidate the two chancery causes, we think the court clearly had jurisdiction. Moreover, Horn might have maintained an action of assumpsit for the value of the stock, and the allegations in the bill would support this theory as well as that of conversion.

In the case of *Darst v. Kirk,* 230 Ill. 521, where an action of law based upon an alleged breach of contract was, by stipulation of the parties, transferred to the chancery side of the court, and it was contended that equity had no jurisdiction, it was said (p. 523):

"There is, however another class of cases, involving matters of contract and the like, which, while they do not come within the ordinary jurisdiction of a court of equity, yet only want some equitable element to bring them within such jurisdiction, and in such cases the defendant by his action may estop himself to afterward raise the question of jurisdiction in the trial or upon appeal."

In *Law v. Ware,* 238 Ill. 360, it was held that in a certain class of cases, where the facts create some equitable right, a court of chancery will take jurisdiction, and that an objection that there was an adequate remedy at law should be taken at the earliest opportunity. In the instant case, the point that a court of equity had no jurisdiction appears to have been raised for the first time in this court. We think that the cause of action as disclosed by the record, involving in reality a series of suits both at law and in equity, warranted the court under the stipulations of the parties to take jurisdiction and determine the rights of the parties.

The remaining question to be determined is as to whether the master correctly fixed the value of the stock. As above stated, the master found the value to be $77,370. Horn takes the position that this was fixed at too small a sum and under any view of the evidence the book value of the stock was $98,305.71, and that if Horn was entitled to enforce the contract of June, 1915, Nessen should be required to pay him that amount, but if it be held that Horn could recover only on the theory that Nessen had converted

the stock to his own use, he was entitled to recover the fair cash value of the stock and on that basis a decree should be entered against Nessen and in favor of Horn for $158,305.71.

The master found that the net value of the Lumber Company's property was $386,830; that Horn's 200 shares, being one-fifth of the capital stock, were worth $77,770. There were only a few items concerning which there is any dispute between the parties. They are: (1) Two steamboats (2) What is designated operating contracts (3) The value of two timber tracts of land and (4) The profits on orders taken by the Lumber Company before January 1, 1920, but which orders were not filled until after that date.

(1) The two boats owned by the Lumber Company were known as the "Dempsey" and the "Nessen." The "Dempsey" was carried on the books of the Lumber Company at $28,719. The master found it to be worth $40,000. This amount is within the testimony given by the several witnesses. Those called upon behalf of Horn placed the boat at a much greater value, while those that testified on behalf of Nessen placed the value of it at less than that found by the master. The boat "Nessen" was carried on the books at $9,186. The master found it to be worth $15,000. The testimony given in regard to the value of this boat is to the same effect as that given in reference to the value of the "Dempsey," witnesses for Horn placing the value higher than that found by the master, and those called by Nessen placing it lower. We have considered all the evidence in this respect and are of the opinion that we would not be warranted in disturbing the finding of the master.

(2) The next item complained of is what is known as operating contracts. These were contracts made by the Lumber Company whereby it was to advance money to enable certain mills to saw timber into lumber; that the Lumber Company should have a lien on the lumber

for such advances; that it should sell the lumber, deducting its advances and have a certain commission for its services. The master allowed nothing for this item. He gives no reason for his conclusion. Counsel for Horn contends that these are valuable contracts; that the Lumber Company had similar contracts for the years 1918, 1919 and 1920 and that during a period of about 35 months for the three years mentioned, the Lumber Company had made a profit of more than $60,000 on one of the contracts, and on another more than $18,000, and on a third a profit of more than $35,000. But counsel for Nessen say that in arriving at these sums no allowance was made for overhead expense and that no one could tell whether there might be a loss through fires and that other hazards were such as to render them of no value. We think the evidence in the record is too meager and of too uncertain a character to warrant any allowance for these contracts. One of the contracts is dated December 28, 1916, and it does not appear when it expired nor is there enough information to warrant the conclusion that it has any value. Another contract is dated September 7, 1917, and it is there stated that the estimated duration of the contract was three to four years from the date made. It would appear that this contract had practically expired. The third contract is dated February 11, 1918, and states it is subject to be canceled by either party on thirty days' notice. It seems clear that this contract could not be a basis for an allowance.

(3) The evidence discloses that the Lumber Company had purchased two tracts of timber land, one known as the Cary & Davidson tract and the other as the Honsberger tract. They had paid on account of the purchase of the Cary & Davidson tract $47,000 and on account of the Honsberger tract $86,000, and these payments were shown upon the books of the company. There was considerable evidence offered

that the two tracts had increased greatly in value. The master found from the evidence that the Cary & Davidson tract had increased in value 15 per cent and the Honsberger tract 20 per cent, making a total increase of $24,420, which amount he added to the assets of the Lumber Company. Horn's contention is that the master should have found from the evidence that the Cary & Davidson tract had increased $23,750 in value and the Honsberger tract $43,425, while Nessen's position is that although the evidence shows that the Lumber Company paid or agreed to pay certain sums for the two tracts of land, yet what a particular tract of land is actually worth is a question of speculation. The evidence shows that the Lumber Company purchased the Cary & Davidson tract in August, 1919, for $72,000, of which they had paid $47,000, that they had invested $86,850 in the Honsberger tract, but whether this was a part of the purchase price, or all of it, is not pointed out by counsel for either side. Counsel for Horn, in contending that the master fixed the value of these tracts too low, points out the testimony given by witnesses called in his behalf. The evidence given on behalf of the defendant in this respect is not pointed out by either side. The record is voluminous, and in these circumstances we think we ought not to be required to search through the record to find what the defendant's witnesses testified. From this it follows that the finding of the master cannot be disturbed.

(4) Horn contends that there should have been included in the assets of the Lumber Company the profits which were realized by the Lumber Company from orders which it had on hand on January 2, 1920, but where the shipments of lumber to fill such orders were not made until after that date, amounting to the sum of $11,335.22; that the evidence shows that the cost of filling these orders, including overhead expenses, would be from 3 to 7 per cent, and that de-

ducting the maximum of 7 per cent would leave a net profit of $10,541.76. The master made no allowance for this for the reason, as stated, by him, that he regarded the business as having been liquidated on January 2, 1920. This finding of the master was based on a construction of the contract between Horn and Nessen, he having reached the conclusion that Nessen was obligated to pay Horn the book value of the 200 shares of stock and the question as to what amount Nessen was liable for on the theory that the stock had been converted by him was in no way considered by the master.

William R. Kamps, a public accountant, testified that he made an examination of the books of the Lumber Company; that the books showed certain orders which the Lumber Company had on hand January 2, 1920, but the shipments to fill such orders were made after that date and that the gross commissions earned by the company in the filling of those orders was $11,335.22; that in arriving at this sum he made no allowance for overhead expense, or the cost of making the shipments or collecting the money; that the bulk of the orders were filled by shipments made in January, February and March, and that a few were made later, some as late as November and December, 1920; that the Lumber Company had not received all the money until April, 1922. But that 60 or 70 per cent of the shipments had been paid for much earlier. From the testimony of this witness and there is none to the contrary, and there is no contention that it is not correct, it appears that on these orders the Lumber Company had received $11,325.22. Horn testified that the cost of filling these orders, collecting the money, including the overhead expense, was from 3 to 7 per cent, and there is no evidence to the contrary. Counsel for Nessen has made no reply to the argument advanced by counsel for Horn in re-

spect to this item. Upon consideration of all the
evidence, we are of the opinion that an allowance of
$10,541.75 should have been made for this item.

Counsel for Horn in the last paragraph of his reply
brief for the first time contends that $60,000 should
be added to the value of Horn's 200 shares of stock,
because the evidence discloses that this was the value
of Horn's proportionate share of the good will of
the business. The only evidence to sustain this is
contained in the report made by the witness Kamps,
the public accountant, wherein he closes an itemized
account of the value of the good will as follows: "A
conservative estimate would establish the value of
the good will at $60,000.00." We think this evidence
is entirely insufficient to warrant an allowance for
this item.

As above stated, the master found the value of
the net assets of the Lumber Company to be worth
$386,850, and to this should be added the $10,541.75,
making a total net value of assets to be $397,391.75.
Horn is entitled to one-fifth of this or $79,478.35,
less the amount remaining due and unpaid on the
$20,000 note which the master found was $5,621.13.
Deducting this sum leaves a net amount due Nessen
to Horn of $73,857.22, for which sum Horn is enti-
tled to a decree against Nessen.

Counsel for Horn finally contends that the master
erred in taxing one-half of the costs against him and
that costs so taxed and paid by him was in the sum
of $3,894.18. One of Horn's positions before the
master was that he was entitled under the contract
to be paid the book value of his shares of stock and
the master in making up his report sustained his con-
tention. We hold that the master was wrong, and,
therefore, it would be inequitable to tax all of the
costs against Nessen. In these circumstances, we
think the costs should be divided equally between

Horn and Nessen as recommended by the master, but the costs in this court should be taxed against Nessen, because Horn was defeated in the trial court, and we hold the decree was erroneous.

The decree of the circuit court of Cook county is reversed and the cause remanded with directions to enter a decree that Nessen pay Horn $73,857.22, in accordance with the views herein expressed.

*Reversed and remanded with directions.*

TAYLOR, J., concurs.

THOMSON, J., specially concurring:  While I concur in the decision of this case, I do not agree with all that is said in the foregoing opinion, particularly in regard to the occurrence of September 9, 1919, and also concerning the alleged failure of Nessen to fulfill the terms of the contract of 1915, which called for co-operation on his part, in the conduct of the Lumber Company's business.