ROBERT E. MARTIN, Plaintiff-Appellee, Cross-Appellant, *v.* ORVIS BROTHERS & Co., Defendant-Appellant, Cross-Appellee.

(No. 58805;

First District (2nd Division)—December 17, 1974.

McDermott, Will & Emery, of Chicago (Hamilton Smith and Bruce H. Schoumacher, of counsel), for appellant.

Hartigan & Ward, of Chicago (William M. Ward and David M. Hartigan, of counsel), for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Robert E. Martin filed an action pursuant to the Securities Law of 1953 (Ill. Rev. Stat. 1971, ch. 121½, par. 137.1 *et seq.*) to void the sale of securities and to recover the purchase price, plus interest and attorney's fees, on the ground that the securities were not registered with the Secretary of State as required by law. Defendant, Orvis Brothers & Co. (hereinafter Orvis), counterclaimed to recover the sum owed by plaintiff to defendant for stock purchased but for which payment had not been made. The case was tried before the court without a jury, with judgment being entered in favor of the plaintiff on his complaint in the principal sum of $243,649.01, together with interest of $57,233.90 and attorney's fees of $37,500; and for defendant on its counterclaim in the principal sum of $79,936.47, together with interest of $20,714.95. This appeal is from the entry of judgment in favor of plaintiff on the complaint. Plaintiff cross-appealed from the entire order, except to the extent it awarded plaintiff's attorney's fees and the principal sum of the counterclaim. The facts, in selective part, follow.

Plaintiff, Dr. Robert E. Martin, was licensed to practice medicine in 1936 and later specialized in internal medicine and radiology. He made early investments in oil and real estate, but by late 1968, he had disposed

of his real estate investments. In November of 1965 he began to substantially invest in the stock market, and between then and May 1969, he purchased and sold stock with approximately 17 brokerage houses. During this period he purchased securities costing $6,979,899.96 and sold securities for a price of at least $5,607,526.72. To finance his market activity, plaintiff borrowed money from various Chicago banks; his loans from seven of the banks totaled at least $2,386,800. Although, during this period, plaintiff maintained his medical office and pursued his medical practice, a great, if not the greater, portion of his time appears to have been devoted to his market activity.

During the period of April 15, 1968, thru April 11, 1969, Martin purchased through Orvis, a registered broker-dealer, 25,190 shares of the common stock of Gamma Process Company, Inc., for a total cost of $678,085.74. It is undisputed that the Gamma stock was unregistered in Illinois and sold over the counter (see Ill. Rev. Stat. 1971, ch. 121½, pars. 137.5, 137.12 A & D), and that on June 10, 1969, Martin served his written notice of rescission upon Orvis. See Ill. Rev. Stat. 1971, ch. 121½, par. 137.13.

The particulars of the Gamma stock purchases from Orvis are as follows: Martin purchased the entire 25,190 shares of Gamma stock from defendant through its registered representative, Lee Robert Artoe. Artoe had previously handled an account for Martin at Merrill Lynch.

Martin testified that on April 14, 1968, Artoe, to whom he had not spoken in approximately 3 months, called to say that he was now associated with Orvis and had a "terrific proposition" for Martin as an investment, one which "I highly recommend to you," and which was identified as Gamma Process Company. Martin testified that Artoe called again the next day, and said, "If you are going to buy this stock, let's buy now." He then purchased 500 shares at $12 per share, and before the end of the month had purchased a total of 2,000 shares at prices ranging from $12 to $19 per share.

Martin further testified that he was urged by Artoe to purchase more shares quickly, even if other securities had to be sold to effectuate the additional purchases; that Artoe explained the excellent business prospects of Gamma, which possessed special patents for the process of irradiation, in the most glowing terms; and that Artoe, in May of 1968, had arranged a meeting with Dr. Welt, a key man at Gamma, who confirmed the excellent prospects of Gamma. After the meeting with Dr. Welt, plaintiff testified that Artoe recommended the purchase of 20,000 additional shares, enough to become a director.

By the end of May 1968, plaintiff purchased approximately 7,200 additional shares at prices ranging from $16 to $26 a share; during June 1968,

5,000 more shares were purchased at a price range of $29 to $32. During the period of May and June, both Artoe and Dr. Welt expressed the opinion that the company would grow and the price of the stock would go up. Plaintiff claimed that in July he expressed apprehension to Artoe "about converting good securities to buy this over-the-counter stock," and told Artoe that his funds were running low. But Artoe pressed him to buy more and said that he had some connections at banks from which Martin could obtain additional funds. From July 1 to July 13, 1968, plaintiff purchased 1,300 shares at prices ranging from $40.50 to $45.00. At this juncture, the stock had peaked in price and plaintiff's total acquisition was 15,600 shares.

Thereafter, in November of 1968, Martin attended a meeting with Artoe at which a Mr. Arnel, the president of Gamma, and a Dr. Silverstein, the vice-president in charge of research, stated the very favorable business prospects of Gamma. It was a promotional meeting, attended by 40 to 50 people from various brokerage houses. Martin then met privately with Artoe, Arnel and Silverstein, who further discussed the possibility of Martin becoming a director and told him that he would become a wealthy man from his investment in Gamma. Artoe continued to recommend the stock to Martin as a long-term investment. Plaintiff made his last purchase of stock on April 11, 1969, his total shares now numbering 25,190 for a total purchase price of $678,085.74. The stock was then selling at $18 a share.

Martin stated that in January of 1969, he spoke with Kurt Karmin, a stock broker at Freehling & Company, concerning a quote on Gamma stock; Karmin told Martin that he thought Gamma Process stock was not registered, but wasn't sure. Martin immediately called Artoe who stated that Karmin was full of "hot air," that the company was doing business in Illinois and must have been registered.

Martin stated that he telephoned Karmin in the early part of May, to ask him the quote on Gamma and during this conversation Karmin said that he was positive that Gamma stock was not registered. Martin called the Secretary of State's office which advised him that the stock was not registered. After confirming the nonregistration of the stock, Martin called his attorney, Jay Erens, who told Martin that he had a right to rescind. Martin placed the conversation with Erens about the middle of May.

Jay Erens testified that the conversation took place on June 2, at which time Martin told Erens that Gamma stock was not "qualified for sale" in Illinois, and stated "I don't know what that means."

Kurt Karmin testified for plaintiff and stated that he first heard of Gamma when Martin invited him to attend a meeting at the Union

League Club in the fall of 1968 or 1969. The witness did not attend the meeting, but had four other conversations with Martin about Gamma, the second of which occurred months after the first, the third weeks after the second, the fourth days after the third, and the fifth hours after the fourth. He placed his first statement to Martin to the effect that Gamma was not registered in the third conversation. On cross-examination the witness admitted that he could not recall the exact time when Martin invited him to the meetings at the Union League Club, nor was he sure about the time relationship between the various conversations. Although he was faint in his recollection, he did not deny that on August 28, 1969, he told a member of Orvis that the conversation with reference to non-registration occurred when Gamma stock was selling in the range of $33—$35 a share, which would place the conversation sometime in July or August of 1968.

Robert Artoe, testifying for the defense, stated that after Martin's account was closed out at Merrill Lynch on February 2, 1968, he talked to Martin nearly every day, keeping him abreast of the market. After he went to work for Orvis in early April, Artoe called Martin and advised him that he could trade with Artoe at Orvis. He testified that at the outset he mentioned Gamma to Martin as a stock he liked, and thereafter supplied information to Martin about Gamma on the latter's request. Artoe admitted that he invited Martin to meet with Dr. Welt of Gamma in May of 1968, but denied telling Martin that he ought to buy Gamma stock, or that he should have a designated position in the stock. Artoe testified that after the dinner on May 7, and prior to Martin's purchase on May 8, he told Martin, "This has to be considered long term for now because that much stock can't be immediately liquidated." On May 30 or 31, when Martin wanted to buy still more Gamma stock and Gamma was selling for $25 a share, Artoe testified, "I told him absolutely not to. My exact words were 'Put this to sleep.'" Artoe testified that, in connection with Martin's purchases on June 20 and June 21, he stated to Martin: "Please don't. Put this one to sleep. We have plenty. I also believe it is going quite a bit higher, but we have plenty. Let's let it rest." Subsequently, on July 8, Artoe told Martin that the stock was going up very nicely, and "I wondered if it would become an offer wanted situation." Sometime between July 19 and August 12, 1968, Artoe testified that he told Martin, "Come on, damn it, you have got enough of this stuff." Martin asked him if the stock was going to go up and Artoe answered, "Yes, I do." Martin then bought more shares.

In late July or early August of 1968, Artoe stated that he had a telephone conversation with Martin in which Martin said, "You know, Hotshot, that stock is not registered in Illinois." Artoe testified that he told

Martin that if Gamma was not registered under Illinois securities laws, he was entitled to return his stock, and get his money back. He said that since the market price was substantially above his average cost, he assumed Martin did not want to do that, with which Martin agreed.

It is undisputed that on September 26, 1968, Martin opened a second account at Orvis in the name of "Mr. Robert E. Martin" with a view to applying the so-called Crystal-Doyle technique. (See *Doyle v. Commissioner* (7th Cir. 1961), 286 F.2d 654.) Thereafter, 9,300 shares of Gamma, which were purchased by Martin between June 20, 1968 and August 12, 1968, were transferred from the account of "Dr. Robert E. Martin" to the account of "Mr. Robert E. Martin" and a commission was paid to Orvis on the transaction. The technique was employed at the suggestion of Artoe, and by reason of the transaction, Martin was able to claim a short-term loss of $123,625.55.

Although defendant, in the trial below, conceded that Gamma was not registered in Illinois, it raised several affirmative defenses. It first argued that the sales to Martin of Gamma stock were not "solicited," and therefore, the stock fell under section 4N of the Law (Ill. Rev. Stat. 1971, ch. 121½, par. 137.4N), which exempts a broker-dealer from liability for the sale of unregistered securities if it acts only as a broker for a customer in the transaction and had not solicited the trades. Defendant also argued that Martin was a "dealer" in securities and therefore defendant was exempted from liability under section 4C. (Ill. Rev. Stat. 1971, ch. 121½, par. 137.4C.) Apart from the above exemption provisions, defendant asserted that the notice of rescission was untimely, and further, that Martin was equitably estopped from rescinding the 9,300 "Crystal-Doyle" shares purchased between June 20 and August 12, and transferred to a second account in September of 1968.

At the conclusion of the trial, the court, sitting without a jury, found that the notice of rescission served upon Orvis was timely within the purview of section 13B of the Law (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13B)); that as a matter of fact and law, Martin was not a "dealer" within the meaning of section 4C; that although Artoe initially solicited the sales of stock, the solicitation terminated on July 15, 1968, and sales thereafter were not subject to rescission; and that plaintiff was equitably estopped from rescinding the 9,300 shares involved in the "Crystal-Doyle" transaction.

■■ The parties to this litigation have requested an interpretation of various sections of the Illinois Securities Law, and we think it appropriate to initially note the purpose of the Law. The legislative intent in enacting the Securities Law has for its object the protection of the public from unscrupulous stock promoters. Registration with, and approval by,

the Secretary of State is the primary safeguard, and comprehensive action against all participants in an unauthorized sale is the primary remedy. (*Silverman v. Chicago Ramada Inn, Inc.*, 63 Ill.App.2d 96, 211 N.E.2d 596.) The Law is paternalistic in character and should be liberally construed to better protect the public not just from fraud or dishonesty, but also from the incompetence, ignorance and irresponsibility of persons engaging in the business of disposing of securities to the public. (*Foreman v. Holsman*, 10 Ill.2d 551, 141 N.E.2d 31; *Meihsner v. Runyon*, 23 Ill.App.2d 446, 163 N.E.2d 236.) Accordingly, the prohibition against the solicited sales of unregistered securities is unqualified. No knowledge that the security is unregistered and no intent to defraud the purchaser are required. The statute was designed to prevent injury to the investing public and it indicates a legislative purpose to impose absolute liability for its violation. *Home Indemnity Co. v. Reynolds & Co.*, 38 Ill.App.2d 358, 187 N.E.2d 274.

From these general propositions we turn to defendant's contention that the trial court erred in finding that plaintiff's notice of rescission was timely within the purview of section 13(B) of the Law which provides, *inter alia*: "Notice * * * shall be given by the purchaser, within 6 months after the purchaser shall have knowledge that the sale of the securities to him is voidable * * *" (Ill. Rev. Stat. 1971, ch. 121½, par. 137.13(B).) The trial court, in holding that Martin first had knowledge that the sales were voidable in early June 1969, after conferring with his attorney, relied upon *Curtis v. Johnson*, 92 Ill.App.2d 141, 155, 234 N.E. 2d 566, which, in reference to section 3B of the Law, stated:

> "Knowledge that the sale is "voidable" is a mixed question of fact and law on which a laymen is entitled to acquire his first knowledge from an attorney."

Defendant argues that the legislature did not intend that the 6-month period of section 13B would run *only* when knowledge of the sale's voidability was acquired from an attorney. Since the trial court, defendant asserts, read the holding of *Curtis* as an absolute requirement of the statute, the court erred as a matter of law. Further, defendant argues that since Artoe was a credible witness and Martin was not, the manifest weight of the evidence is that Martin had knowledge that the Gamma transactions were voidable in July or August of 1968, when Artoe, according to his testimony, told Martin that if the stock was not registered, Martin could rescind. Alternatively, defendant asserts that the manifest weight of the evidence is that Martin knew that Gamma stock was not registered prior to December 10, 1968, and that such knowledge was sufficient to trigger the 6-month period of section 13B. This proposition is based upon the general rule that one who has sufficient knowledge

to be put on inquiry cannot escape the consequences of his knowledge by failing to make inquiry.

■■ The 6-months rule regarding notice is not a statute of limitations, but rather an equitable feature built into the statute to protect against stale claims. (*Gowdy v. Richter*, 20 Ill.App.3d 514, 314 N.E.2d 549.) Its purpose is to prevent purchasers, who have sufficient knowledge of the remedy available to them, from waiting the entire statute of limitations to decide whether to elect rescission. *Norville v. Alton Bigtop Restaurant, Inc.*, 22 Ill.App.3d 273, 317 N.E.2d 384.

We must agree with defendant's contention that the trial court did not employ the proper standard in determining the time plaintiff obtained sufficient knowledge to commence the running of the 6-month period. In holding that legal consultation was a prerequisite to the running of the rescission-notice period, the trial judge misinterpreted our earlier decision in *Curtis v. Johnson*, 92 Ill.App.2d 141, 234 N.E.2d 556. As a reading of the opinion makes clear, the only question which this court decided in *Curtis* is whether an allegation that a purchaser of unregistered securities acquired his first knowledge of the sales' voidability from an attorney was sufficient to support a cause of action. However, neither *Curtis* supports, nor does section 13B warrant, the conclusion that legal consultation is a necessary prelude to the running of the rescission-notice time period. Having applied an improper standard in determining the issue of timely notice, the trial court erred as a matter of law. However, we cannot accept defendant's assertion that there is no need to remand the cause because the manifest weight of the evidence is that plaintiff knew the transactions were voidable in July or August of 1968, or alternatively, knew that Gamma stock was not registered prior to December 10, 1968.

The evidence concerning the question of when plaintiff first acquired actual knowledge that his purchases of the instant stock could be rescinded is in direct conflict. Plaintiff testified that he acquired this knowledge for the first time from his lawyer in late May or early June of 1969. However, Artoe testified that he had informed plaintiff that the latter could "get his money back" in July or August of 1968. Due to his interpretation of the *Curtis* decision, the trial judge never resolved the conflicting testimony. It is well established that resolution of conflicting evidence is preeminently a question for the trier of fact. Upon the record before us, this court is not in a position to resolve such conflict as a matter of law.

■■ Defendant's alternative argument, that the manifest weight of the evidence is that plaintiff had knowledge of the nonregistration of the stock prior to December 10, 1968, assumes that knowledge of the non-

registration of the stock is synonymous with knowledge of the sales' voidability. However, the statute does not require the election to rescind be made 6 months after notice that the securities are not registered, but specifically requires that an election be made 6 months after the purchaser has knowledge that the sale is "voidable." Given the paternalistic nature of the Law in protecting investors, and the liberal construction which is to be employed in furtherance thereof, it would be improper to rigidly equate knowledge of the sales' voidability with knowledge of the nonregistration of the stock. It is equally true, however, that the statute does not require actual knowledge of the sales' voidability, and consequently, the legal maxim that "the law charges a person with the knowledge he might have obtained by making use of the means afforded him" applies. (See *Gowdy v. Richter*, 20 Ill.App.3d 514, 314 N.E.2d 549.) While knowledge of the stock's nonregistration is a factor in determining whether a purchaser had constructive knowledge of the sales' voidability, it is not singularly decisive. Like the issue of actual knowledge, the question of whether Martin had constructive knowledge of the sales' voidability, as well as the question of when he acquired knowledge of the nonregistration of the stock, is properly determined by the trier of fact.

Defendant's next contention is that plaintiff was a "dealer" within the meaning of section 4C of the Law (Ill. Rev. Stat. 1971, ch. 121½, par. 137.4C), and therefore, the sales to Martin were exempted from registration. A dealer is defined in section 2.7 as one who "engages * * * for all or part of his time, directly or indirectly, as agent, broker or principal, in the business of offering, selling, buying and selling, or otherwise dealing or trading in securities issued by another person." (Ill. Rev. Stat. 1971, ch. 121½, par. 137.2—7.) Defendant argues that plaintiff devoted enough time to buying and selling securities to be deemed engaged in the business of so doing as a dealer within the meaning of section 2.7. In support thereof, defendant points to the fact that not only did plaintiff characterize his business as that of "physician-investor" on his 1967 tax return, but also purchased $1,844,260.81 of securities between April and July of 1968, and sold $1,559,123 of securities during the same period, and additionally, borrowed at least $2,386,000 from nine banks to purchase securities. Considering the intensity of plaintiff's market activities, and widely understood concepts of what constitutes engaging in business, defendant argues, the conclusion is inescapable that Martin was a dealer and all his transactions were exempt from registration. We disagree.

In *Reid v. NX Corp.*, 11 Ill.App.3d 706, 708, 297 N.E.2d 380, this court stated that the purpose of exempting sales from registration when the purchaser is himself a dealer, is that it is assumed dealers, like the other

institutional investors enumerated in section 4C, are capable of protecting themselves and do not require the protection afforded by the Law. However, unless the specific words of the exemption provisions require their inclusion, private investors are not denied coverage under the Law merely because they are "sophisticated investors." (*Mark v. McDonnell & Co.* (7th Cir. 1971), 447 F.2d 847.) Similarly, we judge that the protection afforded the investing public at large should not be diluted by denominating a private investor a "dealer" whenever the magnitude and number of his purchases exceed a certain limit. Such distinction is artificial and frustrates the purpose of the Law. In the present case, it is undisputed that all of plaintiff's security purchases, despite their volume and recurrence, were for his own account; he shared none of the characteristics normally attributable to a dealer. See II Loss, Securities Regulations, ch. 8B, at 1296-1297 (2d ed. 1961).

■■ Furthermore, a statute should be construed so that effect is given to all its provisions, so that no part will be superfluous or inoperative. (*Tan v. Tan,* 3 Ill.App.3d 671, 279 N.E.2d 486.) The legislative intent in excluding from section 4C persons engaged in heavy trading for their own account is evidenced by section 4D which distinguishes between a dealer and a "trader buying or selling * * * in frequent operations, for its or his own account * * * to such extent that it or he may be said to be engaged in such activities as a trade or business." The omission of this latter language from section 4C, which would more aptly be descriptive of plaintiff, must be deemed intentional, and as such, excluded from its operation.

In his cross-appeal, plaintiff contends that the trial court erred in holding that all transactions from July 15, 1968 onward were not "solicited" within the meaning of section 4N of the Law (Ill. Rev. Stat. 1971, ch. 121½, par. 137.4N), which provides for an exemption in the following circumstances:

"The execution of orders for purchase of securities by a registered dealer, provided such dealer acts as agent for the purchaser, has made no solicitation of the order to purchase the securities, has no direct interest in the sale or distribution of the securities ordered, receives no commission, profit, or other compensation other than the commissions involved in the purchase and sale of the securities and delivers to the purchaser written confirmation of the order which clearly identifies the commissions paid to the registered dealer."

The trial court, although finding that Artoe initially "solicited" plaintiff to purchase Gamma stock, accepted Artoe's version of the July 1968

conversation in which Artoe told Martin, "Come on, damn it, you have had enough of this stuff." The trial court held that all transactions subsequent to this conversation were "unsolicited" and therefore exempt from the requirement of registration. In so holding, the court replied upon *Home Indemnity Co. v. Reynolds & Co.*, 38 Ill.App.2d 358, 368, 187 N.E.2d 274, which distinguished solicited and unsolicited sales:

> "A solicited sale is one in which the salesman 'actively encourages the purchase or sale of a security by a client.' Unsolicited sales, in which a customer requests that a security be purchased for him and the salesman just takes the order and acts as agent for the purchaser, are not prohibited."

Plaintiff asserts that the subsequent conduct of Artoe demonstrates the insufficiency, as a matter of law, of the July conversation to terminate the "solicitation" of sales. Plaintiff points to the fact that after the July conversation, Artoe told Martin that the stock would go up, suggested the Crystal-Doyle transaction, and invited him to a meeting at which the prospects of Gamma were again extolled by Gamma's president. Plaintiff further advocates a rule which would continue a broker's liability with respect to repeated purchases of unregistered stock until the broker has advised his customer that he has 6 months in which to elect to rescind, the customer has elected not to rescind, and the broker has obtained a nonsolicitation letter from the customer.

In support of his contention plaintiff relies upon various Federal cases interpreting the concept of "offer to sell" (which includes "solicitation of an offer to buy") under the Securities Act of 1933. (*E.g., S.E.C. v. Liberty Petroleum Corp.*, C. C. H. Fed. Sec. L. Rep., ¶ 93,209 (1971-72 Transfer Binder).) However, these cases deal with an initial solicitation or offer to sell, and not, as the instant case, with the question of whether an initial solicitation may be terminated within a chain of sales.

■■ As to the issue in the present case, we are of the opinion that a solicitation may cease when the broker strongly and emphatically advises his customer not to make any further purchases of the particular stock. Although the trial court found an initial solicitation of stock, it does not necessarily follow that all subsequent sales must, as a matter of law, be deemed as solicited. The language of the statute does not require such a holding, nor has plaintiff presented authority which compels such construction. The trial court apparently did not view Artoe's conduct subsequent to the July conversation as conduct designed to procure additional purchases of Gamma stock, but rather, as continuing service to a customer who had already made a substantial investment in Gamma. Given the direct and unequivocal character of Artoe's advice

not to make further purchases of Gamma stock, the finding of the trial court was not prohibited by section 4N (Ill. Rev. Stat. 1971, ch. 121½, par. 137.4N), nor was it against the manifest weight of the evidence.

Plaintiff's next contention is that the trial court erred in holding that Martin was equitably estopped from rescinding the 9,300 "Crystal-Doyle" shares purchased between June 20 and August 12, and transferred to a second account in September. Defendant's argument is that by selling, or attempting to sell the stock, from one account to another in order to generate a tax deduction, Martin affirmed his purchase of those shares, thereby barring rescission. We disagree.

In the recent case of *Gowdy v. Richter*, 20 Ill.App.3d 514, 525, 314 N.E. 2d 549, this court stated:

> "The law in Illinois is clear in allowing only statutory, not equitable, defenses to be raised by a defendant in a case involving a blue sky violation. The penal character of the statute negates the utilization of *in pari delicto* or estoppel defenses."

In *Hudson v. Silver*, 273 Ill.App. 40, it was argued, in defense to a blue sky violation, that plaintiff, by participating in the dividend of the stock which was subsequently tendered back and having acted as a director in the company even after the stock had been tendered, thereby "affirmed" the contract of purchase. In rejecting the defense, the court noted that although the actions of plaintiff would tend to show affirmance of the transaction in a chancery action, the penal nature of the securities law precluded such defense.

■■ Similarly, in the present case, we think the transfer of stock from one account to another does not preclude rescission of those shares on equitable grounds. There is no statutory exemption covering the transaction, and the parties do not argue that the Federal tax consequences of the transaction affect plaintiff's right to rescind. Plaintiff was the named owner of both accounts, and the transfer did not prevent plaintiff from tendering the identical stock back. (*Cf. Glen v. Dodson*, 347 Ill. 473, 180 N.E. 393.) Accordingly, we hold that plaintiff could rescind those shares of Gamma stock involved in the "Crystal-Doyle" transaction which were purchased before July 15, 1968.

■■ Plaintiff's final contention is that the trial court erroneously allowed interest on defendant's counterclaim for stock purchased but for which payment had not been made. The trial court awarded interest predicated upon the issuance of confirmation slips sent to plaintiff and found that the amount became due on May 1, 1969. Although plaintiff argues that the "confirmation slips" were not "instruments of writing" within the meaning of the Interest Statute (Ill. Rev. Stat. 1971, ch. 74, par. 2), he fails to point out in his brief where in the excerpts or record the docu-

ments may be found, and fails to point out any of the operative facts necessary to an understanding of the issues presented as required by Supreme Court Rule 341(f) (Ill. Rev. Stat. 1971, ch. 110A, par. 341(f)). Plaintiff's omission is particularly serious when, as here, the record contains voluminous testimony and documentary evidence. (See *Horn v. J. O. Nessen Lumber Co.*, 236 Ill.App. 187.) Although the entire record is available to the reviewing court, we are not required to search the record to find a reason for reversing the judgment. (*Elden v. Addison Farmers Mutual Insurance Co.*, 90 Ill.App.2d 417, 233 N.E.2d 42.) On appeal, all reasonable presumptions are in favor of the judgment of the trial court, and the party who prosecutes an appeal has the burden of overcoming these presumptions by affirmatively showing the errors charged. *Husted v. Thompson-Hayward Chemical Co.*, 62 Ill.App.2d 287, 210 N.E.2d 614.

■■ We merely note that a writing in confirmation of the sale or purchase of securities which is not objected to within 10 days after receipt is sufficient to enforce a contract for the sale of securities (Ill. Rev. Stat. 1971, ch. 26, par. 8—319(c)), and as such, may be an "instrument of writing" upon which money becomes due. See *Murray v. J. M. Doud & Co.*, 167 Ill. 368, 47 N.E. 717; *Hufford v. National Retailer-Owned Grocers, Inc.*, 16 Ill.App.2d 1, 147 N.E.2d 437; contra, *Dempsey-Tegeler & Co. v. Irwin* (7th Cir. 1969), 415 F.2d 1348 (wherein the court found no underlying agreement to purchase the securities).

■■ Plaintiff further argues that there was a bona fide dispute concerning the amount due, which could not be determined until plaintiff's claim against defendant was resolved. For interest to attach, prior to judgment, absent an agreement, the amount must be fixed, or determinable, and due, in the sense that a debtor-creditor relationship has come into being. (*Kansas Quality Construction, Inc. v. Chiasson*, 112 Ill.App.2d 277, 250 N.E.2d 785.) If the amount is determinable, interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment (*L. W. Foster Sportswear Co. v. Goldblatt Bros., Inc.* (7th Cir. 1966), 356 F.2d 906, construing Illinois law), and the fact that the parties could reasonably differ as to their liability is not a consideration so far as the statute is concerned. (*Kansas Quality Construction, Inc. v. Chiasson, supra.*) In the present case, the trial court apparently was able to determine the amount due by reference to the confirmation slips. The fact that a portion of the amount due may have arisen in connection with the purchase of "nonsolicited" Gamma stock does not alter the liquidated nature of the claim. (See *Socony Mobil Oil Co. v. Klapal* (D. Neb. 1972), 205 F.Supp. 388.) Accordingly, we affirm the trial court's award of interest on the counterclaim.

In view of the foregoing, the judgment of the circuit court is affirmed in all respects with exception of that part wherein the court held that the notice of rescission was timely and that plaintiff was estopped to rescind the 9,300 shares of Gamma stock involved in the Crystal-Doyle transfer. The cause is reversed and remanded for a determination, in accordance with the views expressed herein, of the time when plaintiff acquired knowledge of the sales' voidability, and, if necessary, for re-computation of the principal amount of plaintiff's judgment and interest thereon, in accordance with our holding that plaintiff was not estopped to rescind that portion of the 9,300 shares of Gamma stock which was purchased before July 15, 1968.

Affirmed in part; reversed and remanded in part.

McNAMARA and LEIGHTON, JJ., concur.