KATHRYN G. ASTE, Independent Ex'x of the Estate of Mary G. Kenney, Deceased, Plaintiff-Appellant, v. METROPOLITAN LIFE INSURANCE COMPANY *et al.*, Defendants-Appellees (Anthony M. Williams, Defendant).

First District (2nd Division)    No. 1—99—2574

Opinion filed March 28, 2000.

Paul J. Bargiel, of Law Office of Paul J. Bargiel, P.C., and Benjamin P. Hyink and Regina A. Scannicchio, all of Chicago, for appellant.

Skadden, Arps, Slate, Meagher & Flom, of Chicago (Charles F. Smith, Deborah G. Solmor, and Albert L. Hogan III, of counsel), for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff appeals from an order of the circuit court of Cook County compelling arbitration. On appeal, plaintiff argues that Illinois arbitration law applies to this case, that the arbitration agreement is void for lack of consideration and that the arbitration agreement is void due to violations of the Illinois Securities Law of 1953 (815 ILCS 5/1 *et seq.* (West 1992)). We reverse.

The plaintiff, Kathryn G. Aste, sued defendants, Metropolitan Life Insurance Company (Metropolitan), MetLife Securities, Inc. (MetLife),

and Anthony M. Williams on various grounds including breach of fiduciary duty, constructive fraud and negligence arising out of financial dealings that the decedent, Mary G. Kenney, had with the defendants. Defendants Metropolitan and MetLife moved to compel arbitration based on the arbitration clause in a document signed by one of their employees and by the decedent. The trial court held a hearing on this issue and ruled for defendants. Both sides were represented by counsel.

According to plaintiff's second amended complaint, plaintiff Kathryn G. Aste is the independent executrix of the estate of Mary G. Kenney, who died on June 7, 1994. Defendant Anthony Williams was employed by Metropolitan from before April 15, 1993, to July of 1993 as an account representative. His duties included contacting elderly individuals for the purpose of persuading them to invest in products offered by Metropolitan and MetLife. Metropolitan directed Williams to offer its estate planning services to potential customers at no charge in order to allow him to introduce himself to such potential customers. Williams, however, could not assist a potential customer with a transfer of assets to MetLife from another company without the participation of Paul Dooley.

Dooley was employed by Metropolitan and MetLife from before April 15, 1993, until after December 15, 1993. Plaintiff alleges on information and belief that Dooley had all the duties and responsibilities of Williams. Additionally, as a registered securities salesperson for MetLife, Dooley was responsible for assisting clients in transferring assets to MetLife from other companies. Dooley was registered as a securities salesperson with MetLife between June 1, 1993, and October 22, 1993.

In April or May of 1993 Williams contacted Kenney by telephone in order to solicit her use of MetLife's estate planning services. In May and June of 1993 Williams and Dooley met with decedent three or four times. On May 18, Williams prepared an estate analysis report for decedent. On May 20, Dooley interviewed Kenney and executed a MetLife Securities, Inc., "customer profile" form which stated that her objectives were to obtain current income and tax advantages. Additionally, a box marked "no" is checked next to a line that inquires if "the fund's investment objective" differs from the client's investment objective. The form contains an arbitration clause which reads:

> "1. MetLife Securities, Inc. (hereinafter 'MSI') and the purchaser of the shares, who is the signatory below (hereinafter the 'Customer'), agree that any controversy between MSI, its employees, directors, agents, officers or affiliates and the Customer arising out of or relating to any transactions between such parties shall be determined by arbitration. Any arbitration pursuant to this agree-

ment shall be conducted before, and under the rules of, the National Association of Securities Dealers, Inc. Judgement upon the award of the arbitrators may be entered in any federal or state court having jurisdiction.

2. This agreement and any arbitration hereunder shall be governed and construed in accordance with the laws of the State of New York, United States of America, including New York procedural and substantive arbitration laws and rules, without giving effect to conflicts of law principles."

The bottom of the form states that it is the "Tampa Mutual Fund Administrative Office Copy." The customer profile was signed by Dooley (on the line identified as "Registered Representative's Signature") and by Kenney. On May 28 Dooley transferred $212,000 from Kenney's Merrill Lynch Federal Securities Trust to various accounts at MetLife.

After June 17, Williams continued to meet with Kenney on a weekly basis. During that time Williams requested and received from Kenney a "loan" of $70,000 in order to start a tavern business. Dooley and Williams subsequently started a tavern business, known as T.J.'s Pub, which closed shortly after its opening. Williams also received three additional checks for $55,000, $55,000, and $27,000, respectively, from Kenney. As a result of these transactions, plaintiff sued Metropolitan, MetLife, and Williams. Defendants Metropolitan and MetLife moved to compel arbitration based on the arbitration clause in the customer profile and their motion was granted by the trial court. This appeal followed.

■ Plaintiff first contends that the Uniform Arbitration Act (710 ILCS 5/1 *et seq.* (West 1992)) applies to this case. Defendants Metropolitan and MetLife (defendants) contend that federal arbitration law (9 U.S.C. § 1 *et seq.* (1994)) governs because the customer agreement involves commerce. We agree with the defendants. The "Supreme Court has held that when a contract involving interstate commerce contains an arbitration clause, Federal law supersedes State statutes, even in State courts." *Konewko v. Kidder, Peabody & Co.*, 173 Ill. App. 3d 939, 942, 528 N.E.2d 1, 3 (1988); see also *Southland Corp. v. Keating*, 465 U.S. 1, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984). Since this contract involves interstate commerce, the federal law of arbitration applies. *Konewko*, 173 Ill. App. 3d at 942. In any event, we believe the result in this case would be the same under either statute. Whether under federal rules or state law, there is no arbitration without a valid contract to arbitrate. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) (stating that without a contract to arbitrate there can be no forced arbitration); *Board of Managers of the*

*Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 74, 697 N.E.2d 727, 731 (1998) (arbitration is a creature of contract). "In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts." *Gibson*, 121 F.3d at 1130. Since the relevant events in this dispute occurred in Illinois, we will look to Illinois law to see if there is a valid arbitration agreement.

■ Plaintiff next contends that the customer profile is not a valid contract because defendants failed to show that MetLife made any promises on behalf of the decedent or the existence of an agreement for the sale of securities to which the arbitration agreement must be applied. Plaintiff maintains that an arbitration agreement with nothing to arbitrate is illusory. Defendant argues that the mutual promise of the parties to arbitrate is sufficient consideration. We agree. Under both Illinois and federal law, a mutual promise to arbitrate is sufficient consideration to support an arbitration agreement. *Michalski v. Circuit City Stores, Inc.*, 177 F.3d 634, 637 (7th Cir. 1999); *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 112, 708 N.E.2d 1140, 1145 (1999) ("Any act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract"). In this case, the parties agreed to arbitrate any disputes arising out of transactions between them. Thus, the lack of transactional contracts between the parties when the customer profile was entered into does not make the mutual promise to arbitrate illusory.

Plaintiff's primary argument is that the customer profile is not a valid contract requiring arbitration because it violates the Illinois Securities Law of 1953 (815 ILCS 5/1 *et seq.* (West 1992)) (the Securities Law) and therefore should be declared void. In support, the plaintiff argues that Dooley was not a registered salesperson when he signed the profile and that the profile therefore constitutes an unlawful solicitation of an offer to purchase securities. Defendants maintain that the trial court was correct in ruling that it was unnecessary for Dooley to be a registered salesperson at the time of the execution of the customer profile, because the Securities Law does not govern the formation of arbitration agreements. In support, defendants argue that the profile does not list, describe or authorize any securities transactions taking place on the date of its execution but merely contemplates future transactions.

■ "The legislative intent in enacting the Securities Law has for its object the protection of the public from unscrupulous stock promoters. Registration with, and approval by, the Secretary of State is the primary safeguard ***." *Martin v. Orvis Brothers & Co.*, 25 Ill. App.

3d 238, 244-45 (1974). Furthermore, the Securities Law is "paternalistic in character and should be liberally construed to better protect the public" from the fraud, dishonesty, incompetence and irresponsibility of persons selling securities. *Martin v. Orvis Brothers & Co.*, 25 Ill. App. 3d 238, 244-45, 323 N.E.2d 73, 78 (1974). Section 8(A) of the Securities Law states that, "[e]xcept as otherwise provided in this subsection A, every dealer, salesperson and investment adviser shall be registered as such with the Secretary of State." 815 ILCS 5/8(A) (West 1992). It is a violation of the Securities Law for any person to "act as a dealer, [or] salesperson *** unless registered as such, where such registration is required, under the provisions of this Act." 815 ILCS 5/12(C) (West 1992). A violation of section 12(C) is a Class A misdemeanor. 815 ILCS 5/14(A) (West 1992). A salesperson is "an individual, other than an issuer or a dealer, employed or appointed or authorized by a dealer, issuer or controlling person *to offer, purchase or sell securities* in this State." (Emphasis added.) 815 ILCS 5/2.9 (West 1992). An offer "shall include every offer to dispose of, *or solicitation of an offer to purchase*, a security or interest in a security for value." (Emphasis added.) 815 ILCS 5/2.5a (West 1992).[1] Therefore, it is a violation of the Securities Law for an unregistered salesperson to sell, offer to sell or solicit an offer to purchase a security. See *People ex rel. Edgar v. Miller*, 110 Ill. App. 3d 264, 270, 441 N.E.2d 1328, 1332 (1982) (holding that an offer to sell bonds without a license was a violation of the Securities Law).

In light of the Securities Law's statutory definitions, we are left with a question of what constitutes an offer, and more specifically, what constitutes solicitation under section 2.5a. While there is little Illinois case law construing the definition of "offer" under the Securities Law, analogies to federal securities law and to the Uniform Securities Act indicate that the definition of "offer" should be construed liberally. In the context of federal securities law, the Supreme Court has stated that the terms "offer" and "sell," "which Congress expressly intended to define broadly[,] *** are expansive enough to *encompass the entire selling process*." (Emphasis added.) *United States v. Naftalin*, 441 U.S. 768, 773, 60 L. Ed. 2d 624, 629, 99 S. Ct. 2077, 2081 (1979) (construing section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a) (1994)), which states that "[i]t shall be unlawful for any person in the offer or sale of securities" by the use of interstate commerce to defraud the purchaser).

---

[1]Additionally, sale under the Securities Law "shall have the full meaning of that term as applied by or accepted in the courts of this State." 815 ILCS 5/2.5 (West 1992).

The Uniform Securities Act[2] (the USA) definition of "offer" is similar to the definition under the Securities Law. Under the USA, "offer" includes "every attempt or offer to dispose of, or solicitation of an offer to buy" a security. Uniform Securities Act § 401(j), 7B U.L.A. 580 (1985). "First, it should be apparent from the breadth of the statutory definition that an offer often will be extended extremely early in the sales process." 12A J. Long, Blue Sky Law § 7.02[1], at 7-18 (hereafter Long). "It should also be obvious that such offers take many forms, some of which the promoter and the general public may not realize constitute offers." Long at 7-19.

An analysis of the few Illinois cases that are relevant also indicates that "offer" should be given a broad construction. Until 1986 there was no definition of "offer" in the Securities Law;[3] however, the Securities Law had a different definition of "sale," which included some of the language now found in the definition of "offer".[4] In *Silverman v. Chicago Ramada Inn, Inc.*, 63 Ill. App. 2d 96, 211 N.E.2d 596 (1965), the plaintiffs bought a 3% interest in the defendant corporation. They made four payments over several months and received their stock when the final payment was made. Plaintiffs then discovered the securities were not registered and brought suit. The defendant argued that the claim was barred by the statute of limitations, which ran from the date of "sale," because the date of sale was the date of the first payment. The plaintiffs argued that the statute ran from the date of the last payment. The court stated that the "definition of a sale is in itself liberal. Its obvious purpose is to exclude nothing that could possibly be regarded as a sale. Under this broad and unambiguous definition *every step toward the completion of a sale would be a sale*."[5] (Emphasis added.) 63 Ill. App. 2d at 101. The court held that the "solicitation by the defendants constituted a sale under the statue as did" all of the payments made by the plaintiffs. 63 Ill. App. 2d at 102. See also *Green v.*

---

[2]Not adopted in Illinois.

[3]The definition of "offer" was added to the Securities Law in 1986 by Public Act 84—869 (Pub. Act 84—869, eff. January 1, 1986).

[4]The old definition of "sale" read:

" 'Sale' or 'sell' shall have the full meaning of that term as applied by or accepted in courts of law or equity, and shall include every disposition, or attempt to dispose, of a security for value. 'Sale' or 'sell' shall also include a contract to sell, an exchange, an attempt or an offer to sell, and option of sale *or a solicitation of an offer to buy* \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1961, ch. 121½, par. 137.2—5.

[5]Furthermore, if "a seller solicited an offer to buy an unregistered security it would be a sale under the terms of the Act and the seller would be in violation of the Act." *Silverman*, 63 Ill. App. 2d at 101.

*Weis, Voisin, Cannon, Inc.*, 479 F.2d 462, 465 (7th Cir. 1973) (stating that the *Silverman* "interpretation of the word sale appears to be in accord with the paternalistic purpose of the" Securities Law).

None of this helps us determine what is meant by the word "solicitation," which is part of the Securities Law's definition of "offer." However, we believe that it encompasses all activities usually engaged in by one attempting to procure a sale or an offer to purchase securities. The American Heritage Dictionary defines "solicit" as "1. To seek to obtain by persuasion, entreaty, or formal application." The American Heritage Dictionary 1163 (2d College ed. 1982). Black's Law Dictionary's definition includes, "[t]o appeal for something; *** to endeavor to obtain by asking or pleading; *** to try to obtain." The definition continues, "[t]o awake or incite to action by acts or conduct intended to and calculated to incite the act of giving." Black's Law Dictionary 1392 (6th ed. 1990). " 'Solicits' clearly includes the kind of activities normally engaged in by a person proposing that another person subscribe to an insurance policy." *Paulson v. Western Life Insurance Co.*, 292 Or. 38, 62, 636 P.2d 935, 949 (1981) (defining "solicits" in the context of an insurance statute).

■ We believe that the *Paulson* definition can be applied to the securities context and that "solicitation" in section 2.5a (defining "offer") clearly includes the kind of activities normally engaged in by a person proposing that another person purchase (or offer to purchase) securities. Therefore, if in the process of soliciting a potential customer a salesperson has the potential customer execute a document that contemplates the purchase of securities, then that document constitutes a solicitation of an offer to purchase securities and is therefore an offer pursuant to section 2.5a of the Securities Law.

■ In this case, the trial court ruled that the customer profile does not "list, describe, or authorize any securities transactions." However, the court also found that the "customer profile contemplates an investment of funds with" MetLife. The profile itself, in the arbitration clause, identifies the customer as "the purchaser of the shares," indicating that a purchase of shares by the customer, from MetLife, is contemplated by the profile. The profile, furthermore, indicates that the "client's main investment objective" is "current income" and "tax advantages." The form also indicates that the client's investment objective does not differ from the "fund's investment objective." This language indicates that the contemplated purchase was of shares of an investment fund. Shares of an investment fund are securities under the Securities Law. 815 ILCS 5/2.1 (West 1992). Clearly this document

contemplates securities transactions.[6] We therefore hold that the customer profile constitutes a solicitation of an offer to purchase securities and is thus an offer pursuant to section 2.5a of the Securities Law.

We must now determine if Dooley's lack of registration as a salesperson when he executed the customer profile will cause the profile and its arbitration clause to fail. We believe that it will. "In Illinois when a statute declares that it shall be unlawful to perform an act and imposes a penalty for its violation, contracts for the performance of an act are void and incapable of enforcement." *Broverman v. City of Taylorville*, 64 Ill. App. 3d 522, 526, 381 N.E.2d 373 (1978). "As a general rule, courts will not enforce a contract involving a party who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public, not as a revenue measure." *Ransburg v. Haase*, 224 Ill. App. 3d 681, 684-85, 586 N.E.2d 1295, 1297 (1992). See generally Restatement (Second) of Contracts § 181 (1981) ("If a party is prohibited from doing an act because of his failure to comply with a licensing, registration or similar requirement, a promise in consideration of his doing that act or his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement").

The case of *Kaplan v. Tabb Associates, Inc.*, 276 Ill. App. 3d 320, 657 N.E.2d 1065 (1995), is closely analogous. In *Kaplan*, plaintiffs entered into a contract for architectural services with the defendant corporation, which was not licensed to practice architecture in Illinois. The contract contained an arbitration clause. The court stated that the practice of architecture affects the public welfare and that it is subject to regulation in the public interest. The court held that "the Agreement between the plaintiffs and the defendant, including the arbitration clause, is void because the defendant failed to obtain a license to provide architectural services." We find the reasoning in *Kaplan* to be persuasive. See also *Tovar v. Paxton Community Memorial Hospital*, 29 Ill. App. 3d 218, 220, 330 N.E.2d 247, 249 (1975) (unlicenced physician's employment contract with hospital unenforceable

---

[6]It should be further noted that the arbitration clause specifies that arbitration is to occur under the rules of the National Association of *Securities* Dealers, and that the line on which Paul Dooley signed is labeled "Registered Representatives Signature," indicating that defendants knew that registration was necessary for the execution of this document.

as contrary to public policy); *cf. South Center Plumbing & Heating Supply Co. v. Charles*, 90 Ill. App. 2d 15, 20, 234 N.E.2d 358, 361 (1967) (refusing to void contract for plumbing work where failure to obtain a permit as required under the municipal code did not harm the public welfare and did not constitute an affront to public policy); *Amoco Oil Co. v. Toppert*, 56 Ill. App. 3d 595, 371 N.E.2d 1294 (1978) (refusing to void a contract where defendant's failure to provide a statutorily required written statement of weight, analysis and the address of the seller with fertilizer delivered to the plaintiff was held to be merely a violation of one minor ordinance in the performance of an agreement and did not impose a serious affront to public policy). But see *First City Securities, Inc. v. Shaltiel*, 44 F.3d 529 (7th Cir. 1995).

There can be little question that the registration requirements in the Securities Law are designed for the protection of the public and reflect a strong public policy. This is clearly the case with respect to the federal securities laws. The Securities Exchange Act of 1934 states that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest" making the regulation of "such transactions and of practices and matters related thereto" necessary. 15 U.S.C. § 78b (1994). Under the Securities Act of 1933 and the 1934 Act, "public policy strongly supports registration."[7] *Securities & Exchange Comm'n v. Wall Street Publishing Institute, Inc.*, 591 F. Supp. 1070, 1079 (D.D.C. 1984) (holding that defendant was an investment advisor and required to register under the federal investment advisors act), *vacated on other grounds*, 664 F. Supp. 554 (D.D.C. 1986), *rev'd & remanded*, 851 F.2d 365 (D.C. Cir. 1988).

As is the case under federal securities law, the purpose of the Securities Law is to protect the public. The "objective of the [Securities Law] is to protect innocent persons who may be induced to invest their money in speculative enterprises over which they have little control." *People v. Bartlett*, 294 Ill. App. 3d 435, 439, 690 N.E.2d 154, 156 (1998); see also *Meihsner v. Runyon*, 23 Ill. App. 2d 446, 163 N.E.2d 236 (1960). "The legislative intent in enacting the Securities Law is clear. The Act has been called 'paternalistic'; by it the State

---

[7]In support of this proposition, the *Wall Street* court cites *Quinn & Co. v. Securities & Exchange Comm'n*, 452 F.2d 943, 946 (10th Cir. 1971), which states that "public policy strongly supports registration," referring to the registration of securities themselves and not to the registration of people who deal in securities. The *Wall Street* court, however, cites this proposition in support of its holding that the defendant in that case was an investment advisor and thus required to register under the investment advisers act.

endeavors to shield its citizens from unscrupulous stock promoters." *Silverman v. Chicago Ramada Inn, Inc.*, 63 Ill. App. 2d 96, 99, 211 N.E.2d 596, 598 (1965). The Securities Law's registration requirements are not mere revenue measures, but require that a salesperson pass an examination to determine if he "has sufficient knowledge of the securities business and laws relating thereto to act as a registered salesperson." 815 ILCS 5/8(C)(7) (West 1992). Furthermore, any applicant for registration must provide any information that the Secretary of State may "prescribe as necessary to determine the salesperson's business repute and qualification." 815 ILCS 5/8(C)(5) (West 1992). Acting as a salesperson without having registered is a misdemeanor. 815 ILCS 5/14 (West 1992). It is therefore readily apparent that the registration provisions of the Securities Law are not simply revenue-raising requirements but are intended to protect the public by ensuring that salespeople meet minimum standards of competence and honesty. Therefore, as is the case under the federal securities acts (see *Johnson v. World Color Press, Inc.*, 147 Ill. App. 3d 746, 748, 498 N.E.2d 575, 576 (1986)), the registration requirements of the Securities Law reflect a significant public policy to protect the public in the purchase and sale of securities.

It may be argued that in this case, unlike the facts in the *Kaplan* case, we are not dealing with an arbitration clause that was ancillary to the contract for professional services but merely with an arbitration clause that stands alone. We nevertheless believe that this is a distinction without a difference. As we previously concluded, the customer profile that contains the arbitration agreement is an integral part of the solicitation effort of the salesperson, which the Securities Law seeks to regulate through its registration requirements. Thus, to the extent that the salesperson who procured the customer profile was not registered (or lacked a license), the product of his solicitation, including the customer profile that he obtained, cannot be recognized.

■ Finally, defendants argue that claims under the Securities Law are arbitrable and that therefore plaintiff's claim that the customer profile and its arbitration clause are void due to violations of the Securities Law should properly be the subject of arbitration. We disagree. There is no dispute that an arbitrator may determine if the Securities Law was violated *once arbitrability has been established*. However, if the question of whether the Securities Law was violated must be answered in order to ascertain the validity of the arbitration agreement, then that determination must be made by a court. The rule is clear that the issue of whether a contract to arbitrate exists must be determined by a court, not an arbitrator. *Kilianek v. Kim*, 192 Ill. App. 3d 139, 142-43, 548 N.E.2d 598, 600-01 (1989); *Barter Exchange, Inc.*,

*of Chicago v. Barter Exchange, Inc.*, 238 Ill. App. 3d 187, 192, 606 N.E.2d 186, 190 (1992); *Kaiser-Ducett Corp. v. Housewrights, Inc.*, 48 Ill. App. 3d 589, 592, 363 N.E.2d 97, 99 (1977); *Matter of VMS Ltd. Partnership Securities Litigation*, 26 F.3d 50, 51 (7th Cir. 1994). In this case, the alleged violations of the Securities Law that defendant seeks to arbitrate are dispositive of the issue of the existence of an agreement to arbitrate, an issue that is not arbitrable.

Defendants apparently argue that in *Nelson v. Roger J. Lange & Co.*, 229 Ill. App. 3d 909, 594 N.E.2d 391 (1992), the court held that a claim of fraud in the inducement of a contract was within the scope of the arbitration clause contained in that contract and that therefore the arbitration clause in this case is broad enough to encompass all of plaintiff's claims, including that the arbitration clause is invalid due to violations of the Securities Law. We believe that *Nelson* is inapposite. First, no claim of fraud in the inducement has been made in this case. Secondly, in *Nelson*, the claim of fraud in the inducement was to the *entire* contract (and thus coincidentally to the arbitration clause as well), and the court held that the scope of the arbitration clause in the contract was wide enough to resolve a claim of fraud in the inducement of the *entire* contract. In its reasoning, the *Nelson* court relied on *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967). In *Prima Paint* the Supreme Court makes it clear that, while a claim of fraud in the inducement of the contract generally is arbitrable, a claim of fraud in the inducement made *against an arbitration clause* is not arbitrable. Such a claim goes to the making of the arbitration clause, an issue that is left for the court under section 4 of the United States Arbitration Act of 1925 (9 U.S.C. § 4 (1994)). Consequently, when the claim of fraud in the inducement goes to the arbitration clause, the court "may proceed to adjudicate it." *Paint Corp.*, 388 U.S. at 403-04, 18 L. Ed. 2d at 1277, 87 S. Ct. at 1806. However, the court is not permitted "to consider claims of fraud in the inducement of the contract generally." 388 U.S. at 404, 18 L. Ed. 2d at 1277, 87 S. Ct. at 1806. In this case, the only contractual provision of the customer profile is its arbitration clause. Any attacks on the validity of the contract thus address only the making of the arbitration clause and may be decided by the court.

Additionally, there may well have been implicit concern in *Nelson* and *Prima Paint* that by permitting the court to decide the issue of fraud in the inducement relative to the arbitration clause it would impact the issue of fraud in the inducement with respect to the substantive provisions of the contract as well. Thus, where the issue of fraud in the inducement goes to the entire contract, by making a decision as to arbitrability, the court may well preempt the determina-

tion of that issue for the entire contract. In such circumstances, the decision as to who decides arbitrability would correspondingly determine who will decide the substantive issues in the case as well. This concern may well present an additional reason why the *Nelson* court held under its facts that the initial determination of arbitrability was one for the arbitrator as well. See generally M. Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act*, 10 Vand. L. Rev. 685, 689-90 (1957). In the subject case there is no such risk, as the question of whether the Securities Law was violated only impacts the issue of arbitrability, and the substantive issues in the case are common law claims for negligence, fraud and breach of fiduciary duty, as only those causes of action were alleged in the complaint.

For the reasons discussed above, the trial court's order compelling arbitration is reversed and this cause is remanded for further proceedings not inconsistent with this opinion.

Reversed; cause remanded.

COUSINS, P.J., and McNULTY, J., concur.